[Cite as *Leeseberg & Valentine, L.P.A. v. Willman*, 2024-Ohio-4879.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Leeseberg & Valentine, L.P.A.,  :

      Plaintiff-Appellee,  :

                               No. 23AP-181
v.  :  (C.P.C. No. 20CV-2820)

Connie Willman et al.,  :  (REGULAR CALENDAR)

      Defendants-Appellants.  :

                                 :

---

D E C I S I O N

Rendered on October 8, 2024

---

**On brief:** *Leeseberg Tuttle, Gerald S. Leeseberg*, and *Craig S. Tuttle* for appellee. **Argued:** *Gerald S. Leeseberg.*

**On brief:** *Hanna, Campbell & Powell, LLP, Frank G. Mazgaj, Douglas G. Leak*, and *Frank G. Mazgaj, Jr.* for appellants. **Argued:** *Frank G. Mazgaj.*

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Plaintiff-appellee, Leeseberg & Valentine, L.P.A. ("L&V"), brought a claim in quantum meruit against their former clients, defendants-appellants, Connie Willman and Jay Woodworth, for the value of legal services the firm rendered while representing them in an action against the manufacturer and installer of spray foam installation that damaged their home. L&V claimed that their services were responsible for the entirety of the eventual $550,000 settlement their former clients reached. After a bench trial, the Franklin County Court of Common Pleas agreed and entered judgment in the firm's favor for one third of the settlement amount. Ms. Willman and Mr. Woodworth have appealed, arguing that a number of the trial court's rulings and the fee award itself were erroneous. For the

reasons that follow, we find basis for the error they assert, and therefore affirm the judgment of the trial court.

## I.   Factual and Procedural Background

{¶ 2}   Appellants' house was originally built in 1855 and sits on a "small working farm" of five acres.  (Oct. 31, 2022 & Nov. 1, 2022 Tr. at 457.)  In 2007, they added an addition onto the house.  *Id.* at 458.  In December of 2013, appellants hired R-Pro to conduct an energy audit, after which they hired the company to install a spray foam to insulate their home.  *Id.* at 460.  R-Pro began the installation in March of 2014.  *Id.* at 461.  When Ms. Willman arrived home after the first day of the installation, the house "really smelled like chemicals."  *Id.*  The installation took three days.  *Id.*  In the week afterwards, she "started to not feel well," culminating in her having to seeking medical attention because she felt like she "was burning from the inside out."  *Id.* at 462.  After notifying the R-Pro salesperson of her reaction, the company's owner visited the house and told appellants that they "were not supposed to be in the house" during the installation.  *Id.* at 463.  The salesperson was supposed to have told them not to be there, but he did not.  *Id.*  After R-Pro demanded payment for work that appellants believed "was not done correctly," they decided to obtain legal representation.  *Id.* at 466.

{¶ 3}   Ms. Willman and Mr. Woodworth initially retained counsel, who represented them for a time while they were in contact with the insulation manufacturer and insurance companies.  *Id.* at 467-72.  Eventually, they "parted ways" with him.  *Id.* at 473.[1]  After that, Ms. Willman and Mr. Woodworth "waited months" while "going back and forth" with the manufacturer until its representatives "stopped talking" to them.  *Id.*  They discussed the case with several attorneys before they contacted L&V.  *Id.* at 474-75.

{¶ 4}   Ms. Willman and Mr. Woodworth retained the firm on January 28, 2015.  *Id.* at 477.  They signed a contingent fee agreement agreeing to retain L&V "to recover [from] any and all persons who may be responsible for damages and injuries" they sustained "as a

---

[1] At trial, Ms. Willman and Mr. Woodworth provided different reasons for the termination of the representation of their first attorney. According to Ms. Willman, the attorney wanted to sue the manufacturer because settlement had stalled, but she and Mr. Woodworth did not "want to file a lawsuit," so they "parted ways" with him. (Tr. at 473.) Mr. Woodworth testified that "things were just kind of dragging along" so he emailed the attorney and said: "Let's go. Let's get moving." *Id.* at 681-82. The attorney responded: "I'm done with you. We have a personality conflict," thereby terminating the representation. *Id.* at 682.

result of home insulation work completed by R-Pro, LLC." (Ex. 1, Apr. 20, 2020 Compl.) Under the agreement, the firm was entitled to 40 percent "of all amounts recovered," minus expenses. *Id.*

{¶ 5} On behalf of Ms. Willman and Mr. Woodworth, L&V filed suit against R-Pro, the insulation manufacturer, and other individuals on May 1, 2015 in Case No. 2015-CV-3707 (hereinafter, "2015 Litigation"). (Tr. at 24.) Attorney Craig Tuttle, an associate at L&V, conducted much of the early investigative and "information gathering" on the case. *Id.* at 66. After almost a year of such work and conducting five depositions, Ms. Willman sent Attorney Leeseberg an email thanking several of the firm's employees, including Mr. Tuttle, for their work and "hospitality." (Pl.'s Ex. 9, Nov. 13, 2015 email.) The email concluded: "We are looking forward to sitting back and watching you perform your magic at the remaining depositions." *Id.* Mr. Tuttle described the attorney-client relationship as "cooperative" at that time and believed that "the clients were pleased with the work we were doing * * * and felt confident and comfortable with the approach we were taking to the litigation." (Tr. at 73.)

{¶ 6} A year later, however, "the relationship had changed significantly." *Id.* at 83. Mr. Tuttle requested an email from the expert the firm had retained to counter Ms. Willman and Mr. Woodworth's "continued belief" that the spray foam insulation product was defective. *Id.* at 89. (Pl.'s Ex. 10, Nov. 22, 2016 email.) They also believed that the insulation resulted in "dangerous or elevated levels" of formaldehyde in the home, and Mr. Tuttle requested "feedback" from an expert to show them that the levels in their house were normal. (Tr. at 89-91.) According to Mr. Tuttle, the experts' feedback did not allay his clients concerns about either issue, which they continued to raise. *Id.* at 93-94.

{¶ 7} Ms. Willman and Mr. Woodworth also believed that the foam insulation manufacturer had "responsibility for the negligent training" of the workers who installed it, but the firm "quickly determined that that was not a viable claim." *Id.* at 317. Similarly, the clients believed that they had a claim under Ohio Consumer Sales Practices Act ("OSCPA").[2] *Id.* According to Attorney Leeseberg, the case was "purely" one of "negligent installation of an, otherwise, safe product," but Ms. Willman and Mr. Woodworth "were resistant or

---

[2] In Mr. Leeseberg's opinion, pursuing an OSCPA claim would have been "ludicrous" because of the nominal amount of damages allowed. (Tr. at 355.)

unwilling or unable to accept that," resulting in the attorneys experiencing an "ever-increasing degree of a push-back." *Id.* at 316-17.

{¶ 8} As a mediation scheduled for February of 2017 approached, Ms. Willman and Mr. Woodworth had not provided L&V with settlement authorization or a personal property itemization for damages, even though the firm had been waiting "for six or seven months" for both. *Id.* at 94. Because of this, mediation had been delayed from the summer before. *Id.* at 94-95. Mediation dates "were discussed and not scheduled, and then scheduled and canceled" because of the lack of information and authority from the clients. *Id.* at 317-18. In Mr. Leeseberg's assessment, by January of 2017, Mr. Tuttle "was reaching his limit of being able to deal with [appellants] on a professional level." *Id.* at 322. Nevertheless, Mr. Leeseberg counseled him to "just hang in there," as the firm had "already invested two years of work in this case." *Id.* Firing the clients would result in them finding other representation and L&V having to pursue a remedy for their past work in quantum meruit, which Mr. Leeseberg described as "not a pleasant situation to be in." *Id.* at 323.

{¶ 9} Around the same time, L&V's attorneys became aware that Ms. Willman "had been speaking with other attorneys about [the] case," based on statements she made to them and in emails she sent that "appear[ed] to be quoting information from other attorneys." *Id.* at 97. For example, she forwarded emails from attorneys she had consulted about the claims that L&V had told her were not viable, but redacted the attorneys' identifying information. *Id.* at 324. Ms. Willman would not disclose "the names of who she was talking to," which "began to brew this level of distrust and suspicion that they were looking for another lawyer to represent them" instead of L&V. *Id.* After receiving one such email, Attorney Leeseberg responded:

> Let me respond thusly: these kinds of "curbside consults" are not really helpful and are, in fact, frustrating and nonproductive. Please give us the name of the attorney you spoke with so we can find out what factual information/assumptions s/he is opining on, and we can compare analysis. Otherwise, we are simply tilting at windmills.
>
> I am providing you with our analysis below, of which I am confident. (Apparently you, not so much.)

(Pl.'s Ex. 14.)

{¶ 10} On March 2, 2017, Attorney Tuttle emailed Ms. Willman and Mr. Woodworth, again asking for an appraisal report valuing their property in order to establish a settlement demand, as mediation had been rescheduled for May 15, 2017. (Pl.'s Ex. 13 at 2.)

{¶ 11} On April 3, 2017, Mr. Leeseberg emailed Ms. Willman and Mr. Woodworth, stating that because L&V had "not heard back from you regarding a settlement demand amount," the firm had decided to submit a demand to the mediator of R-Pro's insurance policy limit of $1 million and $400,000 from the insulation manufacturer. (Pl.'s Ex 15 at 3.) Mr. Woodworth responded and agreed to the policy limit demand from R-Pro, but insisted on demanding $600,000 from the manufacturer. *Id.* at 2. Mr. Leeseberg replied and refused to ask for the amount requested, stating that the "demand lacks any credibility from a liability or damages standpoint" and would "only insure that [the manufacturer] does not participate meaningfully at the mediation." *Id.* In response, Mr. Woodworth demanded that L&V "tell us what information you obtained in discovery that leads [the manufacturer] to believe they really don't shoulder liability," and again raised the issue of improper training. *Id.* at 1.

{¶ 12} Mediation was held May 15, 2017. After the defendants offered only $50,000, L&V suggested that Ms. Willman and Mr. Woodworth leave the mediation as a "strategy move" in response. (Tr. at 27.) Attorney Tuttle later emailed them, stating that the move "worked well" because the defense attorneys then "spill[ed] more information about where things stand." (Def.'s Ex. G.) He asked Ms. Willman and Mr. Woodworth to come into L&V's office for a short meeting to "come up with a 'bottom line' figure, or some reasonable figure representing where we'd be truly willing to go with the settlement." *Id.* The demand would only be shared with the mediator, Mr. Tuttle stated, in order to determine if settlement were truly possible. *Id.*

{¶ 13} The meeting, however, "did not result in a final number to be communicated" to the mediator. (Tr. at 130.) Mr. Tuttle described it as "difficult," with "frustrations on both sides." *Id.* Rather than resolve the settlement demand amount, the meeting "devolved into rehashing" the conflicting positions of L&V and their clients. *Id.* at 131. L&V's attorneys decided to leave the meeting. *Id.* at 132.

{¶ 14} After this breakdown, "given the nature of the relationship between" Ms. Willman and Mr. Woodworth and their attorneys, the mediator suggested meeting the clients alone to hear his proposal as a "neutral third party," to settle for $550,000. *Id.* at 135. After the meeting, Mr. Tuttle emailed Ms. Willman and Mr. Woodworth, urging them to accept the $550,000 proposal from the mediator, which he believed would be "a good settlement result" for them. (Pl.'s Ex. 17 at 2.) He also informed them that the defendants' attorneys were inquiring about additional depositions before trial, creating costs that might reduce any settlement. *Id.*

{¶ 15} Before he received a response, the mediator emailed Mr. Tuttle to inform L&V that Ms. Willman and Mr. Woodworth had rejected his $550,000 proposal. (Pl.'s Ex. 16.) He also informed L&V: "Much like you guys I have gone at least 225 different ways to tell them why they are wrong. * * * I told them multiple times that they will be very lucky to get half of the mediator's proposal at a jury trial." *Id.*

{¶ 16} Mr. Tuttle then received a response from Mr. Woodworth, stating that their "bottom line" was $800,000 and in the absence of an offer approaching that amount, they were "ready to prepare for trial." (Pl.'s Ex. 17 at 2.) Mr. Woodworth also claimed that there was no $550,000 offer, "at the most maybe $300k unless that number has changed." *Id.* Mr. Woodworth also stated that Ms. Willman had received "abnormal findings" on an ultrasound and was going to undergo additional testing. *Id.* Accordingly, they did "not wish to make any final decisions regarding settlement at this time until she completed all of the testing." *Id.*

{¶ 17} On June 12, 2017, Attorney Leeseberg sent Mr. Woodworth an email stating that "we are confident that the defense has accepted the mediator's proposal for $550,000." *Id.* at 1. The email continued:

> However, it is my perception that even if that is true, you would be unwilling to accept the mediator's proposal against our strong urging and advice.
>
> You claim "you are ready to prepare for trial." What you are *really* saying is, you are ignoring our advice to settle the case, and demanding that we try your case, at the risk of loss to us of substantial litigation expenses we have incurred (and will incur in trial preparation and trial itself), as well as jeopardizing our recovery of compensation for our enormous investment [of] time to achieve this settlement proposal. As

> we discussed during the discussion about [the manufacturer's] motion for summary judgment, I am not willing to have you gamble with our time, effort and expense, while ignoring our recommendations.
>
> At this juncture, two things have become clear to me:
>
> - You and Connie are unwilling to rely upon our professional expertise and advice; and
>
> - Our attorney-client relationship is becoming toxic with continual second-guessing, acrimony, recriminations and oppositional behavior.
>
> For these reasons, I have decided that it is best for both of us to part ways at this time. Please be advised that we are going to take the necessary steps to withdraw as your counsel. We will certainly assist you in obtaining new counsel and if necessary, we can dismiss your case without prejudice so that you can refile it within a year of the dismissal.

(Emphasis sic.)  (Pl.'s Ex. 17.)

{¶ 18} Citing Rules 1.16(b) and (b)(9) of the Ohio Rules of Professional Conduct, L&V filed a motion to withdraw as counsel in the 2015 Litigation on June 22, 2017. (Mot. for Leave to Withdraw as Trial Counsel for Pls., attached as Ex. 1 to Feb. 8, 2021 Pl.'s Memo in Opp. to Def.'s Mot. for Summ. Jgmt.)  Ms. Willman and Mr. Woodworth's new attorney, Blair Lewis, filed a notice of substitution of counsel on July 7, 2017. (Notice of Substitution of Counsel, attached as Ex. 2 to Feb. 8, 2021 Pl.'s Memo in Opp. to Def.'s Mot. for Summ. Jgmt.)  At a hearing on the motion, the trial court refused to continue the trial date of September 18, 2017, as the case had been pending for over two years and the case schedule had been amended several times. (Pl. Ex. 20 at 3-4.)  After suggesting that Ms. Willman and Mr. Woodworth voluntarily dismiss the action under Civ.R. 41 and then refile it, counsel for R-Pro stated that his client would not dismiss the pending counterclaim against them. *Id.* at 4.

{¶ 19} After the substitution of counsel, a deposition of the plaintiffs' expert witness was held.  Citing his testimony, the foam insulation manufacturer filed for summary judgment on the only remaining claim against it, which had alleged that the company breached its duty to warn about the possible toxicity of the product, on August 3, 2017. (Pl.

Ex. 22.) Ms. Willman and Mr. Woodworth settled the 2015 Litigation for $550,000 before trial. (Tr. at 45.) On September 13, 2017, the trial court entered judgment based on the settlement, dismissed all pending claims and counterclaims, and retained jurisdiction until the disbursement of the settlement funds.

{¶ 20} L&V filed a motion to intervene under Civ.R. 24 on November 7, 2017, seeking to assert a claim in quantum meruit against their former clients for attorney fees arising from the previous representation. The trial court granted the motion and L&V filed a third-party complaint on November 14, 2017. Ms. Willman and Mr. Woodworth answered on December 12, 2017, asserting a counterclaim against L&V for breach of contract and a counterclaim against the firm, Mr. Tuttle, and Mr. Leeseberg for legal malpractice.

{¶ 21} On April 2, 2018, L&V commenced a new action in quantum meruit against Ms. Willman and Mr. Woodworth in Case No. 18-CV-2820 (hereinafter "2018 Litigation"). On April 12, 2018, the trial court entered judgment in the 2015 Litigation as follows:

> This matter came on for a Status Conference on April 12, 2018, at which time all pending motions were withdrawn by counsel in consideration of the filing of a new case addressing the issues, *Leeseberg & Valentine, L.P.A. v. Connie Willman et al.,* Franklin County Court of Common Pleas Case No. 18 CV 002820. The settlement funds currently on deposit with the Court shall continue to be held by the Franklin County Clerk of Courts. Said funds shall be designated under Case No. 18 CV 002820.

{¶ 22} Two years later, Ms. Willman and Mr. Woodworth settled their legal malpractice claim against L&V, Mr. Tuttle, and Mr. Leeseberg. (Tr. at 47.) L&V filed a motion under Civ.R. 41(A)(1) to voluntarily dismiss the 2018 Litigation. (Apr. 14, 2020 Pl.'s Notice of Voluntary Dismissal, 2018 Litigation.) On April 20, 2020, the firm again filed suit against Ms. Willman and Mr. Woodworth, seeking fees in quantum meruit arising from its representation of them during the 2015 Litigation. (Apr. 20, 2020 Compl.)

{¶ 23} Ms. Willman and Mr. Woodworth filed a motion to dismiss the complaint under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted, arguing that L&V was precluded under Civ.R. 41(A) from again bringing a claim in quantum meruit

against them.  (May 13, 2020 Def.'s Mot. to Dismiss.)  They argued that L&V had voluntarily dismissed its complaints twice before, once in the 2015 Litigation and again the 2018 Litigation, and that the second dismissal was with prejudice under the rule.  The trial court overruled the motion, finding that "the 2015 Litigation is not a dismissal subject to the double-dismissal rule." (Nov. 3, 2020 Entry at 3.)

{¶ 24} Ms. Willman and Mr. Woodworth raised the same argument in support of a motion for summary judgment, as well as the argument that L&V had terminated its representation of them, and any entitlement to attorney fees arose only the contingency fee agreement.  (Jan. 11, 2021 Def.'s Mot. for Summ. Jgmt.)  By terminating the representation, L&V had "forfeit[ed] any claim for fees under a theory of quantum meruit." *Id*. at 21.  The trial court overruled the motion, again rejecting their argument under Civ.R. 41(A), and stating as well that the contingency fee agreement did not prohibit L&V from seeking compensation under a claim of quantum meruit.  (July 12, 2022 Entry.)

{¶ 25} A bench trial commenced on October 31, 2022.  The testimony of Ms. Willman, Mr. Woodworth, Mr. Tuttle, and Mr. Leeseberg is summarized above.  In addition, the parties called competing expert witnesses to testify about the value of L&V's services.  The firm's expert, Michael Rourke, opined that it was entitled to one third of the settlement amount of $550,000.  Ms. Willman and Mr. Woodworth's expert, Orville Reed, opined that L&V had "breached" the contingency agreement and, "as a consequence, there should be no recovery" under a theory of quantum meruit.  (Tr. at 606.)

{¶ 26} The trial court found that Ms. Willman and Mr. Woodworth engaged in a "pattern of conduct," such as insisting on the viability of claims that their attorneys and expert witness had rejected, consulting other attorneys about such claims, and ultimately refusing to discuss settlement terms with L&V, that "undermin[ed]" the firm's representation and amounted to "a constructive termination" of the attorney-client relationship.  (Feb. 16, 2023 Decision & Entry at 26-27.)  For these reasons, the trial court also found that L&V's actions were supported by "just cause," and the firm did not breach their agreement with Ms. Willman and Mr. Woodworth.  *Id*. at 28.  In the trial court's estimation, Ms. Willman's testimony was "not credible in many respects" because email exhibits and even her own testimony contradicted her statements.  *Id*.  Mr. Tuttle and Mr. Leeseberg's testimony, although occasionally "combative," was "credible." *Id*. at 29. Emails

corroborated parts of their testimony, and they made "honest efforts to be as precise as possible" while also admitting when they could not recall certain events. *Id.*

{¶ 27} With regard to damages, the trial court began by discussing how L&V's expert "reconstructed" the firm's "billable hours based on documented work and independent secondary sources," which amounted to $135,352. *Id.* However, the trial court agreed with the expert's assessment that this amount was probably "20% to 30% less than the actual amount of time expended by L&V." *Id.* at 30. Because the hours expended was only one of several factors to consider, the trial court also discussed the complexity of the litigation and the "many challenges to recovery" raised by the particular factual circumstances of the case. *Id.* In addition, the trial court determined that L&V was "solely responsible for the $550,000 settlement offer." *Id.* at 31. For these reasons, the trial court concluded that "the appropriate award is $183,333.00," equivalent to one third of the settlement amount. *Id.*

{¶ 28} Ms. Willman and Mr. Woodworth appealed and assign the following as error:

> [I.] THE TRIAL COURT ERRED IN DENYING DEFENDANTS-APPELLANTS' MOTION TO DISMISS.
>
> [II.] THE TRIAL COURT ERRED IN DENYING DEFENDANTS-APPELLANTS' MOTION FOR SUMMARY JUDGMENT.
>
> [III.] THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING HEARSAY EVIDENCE AND TESTIMONY REGARDING A PURPORTED $550,000 "MEDIATOR'S PROPOSAL."
>
> [IV.] THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT DEFENDANTS-APPELLANTS TERMINATED THE ATTORNEY-CLIENT RELATIONSHIP.
>
> [V.] THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT THE AGREEMENT PERMITTED APPELLEES TO RECOVER ATTORNEYS' FEES.
>
> [VI.] THE TRIAL COURT ABUSED ITS DISCRETION [BY] DETERMINING THAT APPELLEES' WITHDRAWAL WAS JUSTIFIED.
>
> [VII.] THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING $183,333 TO PLAINTIFF-APPELLEES.

## II. Analysis

### A. First Assignment of Error

{¶ 29} In the first assignment of error, Ms. Willman and Mr. Woodworth assert that the trial court erred when it denied their motion to dismiss L&V's quantum meruit claim under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted. Dismissal was required, they argue, because L&V violated the double-dismissal rule of Civ.R. 41(A)(1), which only allows a plaintiff one opportunity to refile a voluntarily dismissed claim. They read the trial court's April 12, 2018 judgment entry dismissing the 2015 Litigation as a first voluntary dismissal under the rule. According to Ms. Willman and Mr. Woodworth, the April 14, 2020 Notice of Dismissal terminating the 2018 Litigation amounted to a second voluntary dismissal. Thus, they argue that the subsequent refiling of the claim in the present lawsuit violated Civ.R. 41(A)(1) and the trial court should therefore have granted their motion to dismiss.

{¶ 30} In response, L&V argues that the rule only applies to voluntary dismissals by a party, so the trial court's April 12, 2018 judgment entry did not qualify as a first dismissal under Civ.R. 41(A)(1). Thus, the double-dismissal rule did not apply, and the trial court properly denied Ms. Willman and Mr. Woodworth's motion to dismiss.

{¶ 31} We apply a de novo standard when reviewing a trial court's ruling on a motion to dismiss under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted. *Alford v. Collins-McGregor Operating Co.*, 152 Ohio St.3d 303, 2018-Ohio-8, ¶ 10.

{¶ 32} Civil Rule 41(A), which governs voluntary dismissals and their effect, states:

> (1) By plaintiff; By stipulation. Subject to the provisions of Civ.R. 23(E), Civ.R. 23.1, and Civ.R. 66, a plaintiff, without order of court, may dismiss all claims asserted by that plaintiff against a defendant by doing either of the following:

> (a) Filing a notice of dismissal at any time before the commencement of trial unless a counterclaim which cannot remain pending for independent adjudication by the court has been served by that defendant;

> (b) Filing a stipulation of dismissal signed by all parties who have appeared in the action.

> Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits of any claim that the plaintiff has once dismissed in any court.
>
> (2) By order of court. Except as provided in division (A)(1) of this rule, a claim shall not be dismissed at the plaintiff's instance except upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon that defendant of the plaintiff's motion to dismiss, a claim shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under division (A)(2) of this rule is without prejudice.

{¶ 33} The final sentence of Civ.R. 41(A)(1) states the double-dismissal rule. "The sentence setting forth the double-dismissal rule provides that a dismissal under Civ.R. 41(A) is generally without prejudice, but then states an exception to that rule—'a notice of dismissal operates as an adjudication upon the merits of any claim that the plaintiff has once dismissed in any court.' " *Olynyk v. Scoles*, 114 Ohio St.3d 56, 2007-Ohio-2878, ¶ 8. Once a plaintiff files a second notice of dismissal under Civ.R. 41(A)(1), "the second dismissal is with prejudice under the double-dismissal rule, and res judicata applies if the plaintiff files a third complaint asserting the same cause of action." *Id.* at ¶ 10.

{¶ 34} In *Olynyk*, the Supreme Court of Ohio held that "the double-dismissal rule of Civ.R. 41(A)(1) applies only when both dismissals were notice dismissals under Civ.R. 41(A)(1)(a)." *Id.* at ¶ 31. Because the filing of a notice of dismissal under Civ.R. 41(A)(1)(a) is a unilateral action by the plaintiff and "totally within a plaintiff's control, the double-dismissal rule targets only that type of dismissal; the other two types of Civ.R. 41(A) dismissals do not implicate the double-dismissal rule." *Id.* at ¶ 26. Here, L&V filed only one notice of dismissal under Civ.R. 41(A)(1)(a): the April 14, 2020 Notice of Voluntary Dismissal that ended the 2018 Litigation. Because the April 12, 2018 judgment entry dismissing the 2015 Litigation was an order of the trial court, it operated as a dismissal "[b]y order" under Civ.R. 41(A)(2). However, the "double-dismissal rule contained in Civ.R. 41(A)(1) does not apply to a plaintiff's dismissal of claims pursuant to Civ.R.

41(A)(2)." *Olynyk* at ¶ 31. Because L&V only dismissed its quantum meruit claim once under Civ.R. 41(A)(1)(a), the double-dismissal rule did not preclude the firm from refiling the claim in this lawsuit. *See Bank of Am., N.A. v. Pandey*, 10th Dist. No. 12AP-950, 2013-Ohio-3830, ¶ 10 (where previous dismissals were "by order of the court pursuant to Civ.R. 41(A)(2)," double-dismissal rule did not apply to bar foreclosure action); *Thompson v. Ohio State Univ. Hosps.*, 10th Dist. No. 06AP-1117, 2007-Ohio-4668, ¶ 20 (holding that involuntary dismissal of a medical malpractice claim under Civ.R. 41(B)(1) "did not trigger the double dismissal rule and its res judicata effect").

{¶ 35} Ms. Willman and Mr. Woodworth emphasize the following language in the judgment entry that ended the 2015 Litigation: "This matter came on for a Status Conference on April 12, 2018, at which time all pending motions were withdrawn by counsel in consideration of the filing of a new case addressing the issues * * *." (Apr. 20, 2018 Jgmt. Entry, 2015 Litigation.) In their reading, this amounted to a "withdrawal" of L&V's claims "by counsel," and they argue that "the only permissible interpretation of the Trial Court's Judgment Entry was that L&V's first Complaint was a voluntary dismissal under Civ.R. 41(A)(1)." (Brief of Appellants at 22.) However, the judgment entry did not specify what "pending motions" L&V's counsel had withdrawn. The only motion pertinent to the firm's quantum meruit claim was the motion to intervene, which the trial court had granted on November 14, 2017.

{¶ 36} Even if the trial court had mistakenly referred to "pending motions" when intending to refer to L&V's claim, however, appellants' argument contradicts the plain language of the rule and *Olynyk*. Dismissal under Civ.R. 41(A)(1) is accomplished by "a plaintiff, without order of court," but the April 12, 2018 judgment entry is an order of the court under Civ.R. 41(A)(2). The double-dismissal rule applies only to "any claim that the plaintiff has once dismissed in any court," not a claim dismissed by a court. Civ.R. 41(A)(1). In contrast to the "unilateral dismissal" allowed by Civ.R. 41(A)(1)(a), dismissal by stipulation under Civ.R. 41(A)(1)(b) or dismissal by court order under Civ.R. 41(A)(2) may occur "at the plaintiff's instigation," but "neither can be unilaterally accomplished, as both contain significant limitations on the plaintiff's ability to use them." *Olynyk* at ¶ 25. Here, the trial court's judgment entry was not a unilateral action by L&V, but a result of the parties' discussion with the trial court during a status conference. "A dismissal by court

order under Civ.R. 41(A)(2) requires the court to approve the dismissal before it can occur," and that is what occurred here. *Id.*

{¶ 37} Ms. Willman and Mr. Woodworth also warn that a failure to recognize the April 12, 2018 judgment entry as a voluntary dismissal under Civ.R. 41(A)(1)(a) could result in situations where "a party could refile a case an indefinite number of times and simply 'withdraw' the case to avoid" the double-dismissal rule. (Brief of Appellants at 23.)  But "a trial court may appropriately preclude abusive refilings by specifying that any dismissal under Civ.R. 41(A)(2) is with prejudice." *McCullough v. Bennett*, ___ Ohio St.3d ___, Slip Opinion No. 2024-Ohio-2783, ¶ 22, citing *Paul v. I-Force, LLC*, 2d Dist. No. 2016-CA-25, 2017-Ohio-5496.  If the trial court believed that L&V had already enjoyed a full opportunity to litigate its quantum meruit claim, it could have dismissed the claim with prejudice.  By instead contemplating "the filing of a new case," the trial court indicated that L&V should have the chance to prove their claim.  This was the trial court's decision, not that of any party.  Because L&V only voluntarily dismissed their claim under Civ.R. 41(A)(1)(a) once, the double-dismissal rule does not apply, and the trial court therefore properly overruled the motion to dismiss.  The first assignment of error is overruled.

## B.  Second Assignment of Error

{¶ 38}  In the second assignment of error, Ms. Willman and Mr. Woodworth assert that the trial court erred when it denied their motion for summary judgment.  They first argue that they were entitled to summary judgment in their favor based on the double-dismissal rule under Civ.R. 41(A)(1), an argument that they reasserted on summary judgment after the trial court rejected it as grounds for dismissal under Civ.R. 12(B)(6). The trial court did not err when it did not grant summary judgment based on the double-dismissal rule because, as discussed above, the rule did not bar L&V from filing suit.  The remaining arguments challenging the trial court's denial of summary judgment will be addressed after setting forth the applicable standard of review and relevant law.

{¶ 39} An appellate court applies a de novo standard when reviewing a ruling on a motion for summary judgment under Civ.R. 56.  *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.  Under Civ.R. 56(C), a court must enter summary judgment if the evidence supporting the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." "A summary judgment shall not be rendered unless it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor." *Id.*

{¶ 40} "Quantum meruit has been defined as an equitable doctrine based on the principle that one should not be unjustly enriched at the expense of another, to be awarded when one party confers a benefit on another without receiving just compensation for the reasonable value of services rendered." *Turturice v. AEP Energy Servs.*, 10th Dist. No. 06AP-1214, 2008-Ohio-1835, ¶ 31, citing *Metz v. Am. Elec. Power Co.*, 172 Ohio App.3d 800, 2007-Ohio-3520 (10th Dist.). *See also Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989) ("Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered."). "When an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge on the basis of quantum meruit." *Fox & Assocs. Co., L.P.A. v. Purdon*, 44 Ohio St.3d 69 (1989), syllabus.

{¶ 41} Ms. Willman and Mr. Woodworth argue that at the time they filed the motion for summary judgment, "it was undisputed that L&V [had] terminated the attorney-client relationship" with them, so "it was error for the Trial Court to find that there was a genuine issue of material fact on this issue." (Brief of Appellants at 24-26.) They support this assertion by quoting Mr. Leeseberg's email stating that the firm was going to "part ways" with them, as well as Mr. Tuttle's deposition testimony agreeing that Mr. Leeseberg had terminated the attorney-client relationship. *Id.* at 24-25. However, the issue of which party terminated the attorney-client relationship was not a genuine issue of material fact that L&V had to prove to recover in quantum meruit. "Upon discharge or withdrawal, a lawyer may also recover from a client the reasonable value of the services rendered under the doctrine of quantum meruit, which literally entitles the lawyer to 'as much as [is] deserved.'" *Columbus Bar Assn. v. Farmer*, 111 Ohio St.3d 137, 2006-Ohio-5342, ¶ 32, quoting *Black's Law Dictionary* (8th Ed.2004). Because quantum meruit is available as a remedy after "discharge or withdrawal," L&V was not precluded from pursuing this remedy

after withdrawal, and Ms. Willman and Mr. Woodworth were not entitled to summary judgment based on the firm's withdrawal. *Id.*

**{¶ 42}** Ms. Willman and Mr. Woodworth also argue that the parties' contingency fee agreement "did not permit L&V to recover fees if L&V terminated or withdrew from the representation," so the firm was precluded from pursuing a quantum meruit claim against them. (Brief of Appellants at 26.) "Quantum meruit claims are not permitted where there is an express written agreement that addresses fees in the event of termination, and the express written agreement does not permit the attorney to recover fees if the attorney terminates the relationship," they assert, with no citation to any authority for the proposition. *Id.* at 28.

**{¶ 43}** The asserted proposition is not the law in Ohio. A claim in quantum meruit is a claim in quasi-contract, and, by definition, such a claim arises when the parties' contract cannot compensate the plaintiff for services rendered. "A quasi-contract is a contract implied so as to prevent injustice." *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 46 (1984), citing *Rice v. Wheeling Dollar Savs. & Trust Co.*, 155 Ohio St. 391 (1951). "It is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy." *Id.* Thus, if the parties' agreement had addressed the recovery of fees after attorney withdrawal, there would be no need for an equitable action in quasi-contract. And contrary to appellants' assertion, the parties' contingency fee agreement did not address the issue of fees in the event of the firm's withdrawal:

> CLIENTS have the right to terminate the relationship at CLIENTS' discretion, but CLIENTS will remain responsible for all expenses incurred up to the date of termination, and L&.V may be entitled to compensation for the reasonable value of their services should CLIENTS go on to achieve the objectives of the representation or achieve a result substantially similar to the objectives of the representation.
>
> * * *
>
> L&V also has the right to withdraw from the representation as permitted under the Ohio Rules of Professional Conduct including, but not necessarily limited to, Rules 1.16, 1.7, and 1.9 * * *.

(Ex. 1, April 20, 2020 Compl., Ex. 1.)

**{¶ 44}** The agreement did not prohibit L&V from pursuing fees in the event of attorney withdrawal, as appellants claim. Rather, it was silent on the issue of fees other than in the event of termination by clients.

**{¶ 45}** In their briefing, appellants' arguments repeatedly fail to acknowledge that the contingency fee agreement did not provide the basis for L&V's cause of action. In Ohio, quantum meruit is the remedy for an attorney seeking the value of their services performed prior to "discharge or withdrawal" that terminates the representation. *Farmer*, 2006-Ohio-5342, at ¶ 32. Furthermore, "whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge **on the basis** of *quantum meruit*." (Emphasis added.) *Fox* at syllabus.

**{¶ 46}** Ms. Willman and Mr. Woodworth urge this court to follow *Elliott v. Joyce*, 889 P.2d 43 (Colo.1994), a Colorado Supreme Court case holding that an attorney who voluntarily withdrew from representation was not entitled to pursue a quantum meruit claim to recover fees incurred before the withdrawal. We are bound by the Supreme Court of Ohio's holdings in *Farmer* and *Fox*, which allow the remedy of quantum meruit in the event of attorney withdrawal, not the high court of another jurisdiction. Furthermore, the Colorado court has acknowledged that its holding in *Elliot* is in tension with "[t]he majority of other jurisdictions" on this issue. *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 447 (Colo.2000) (citing decisions, including *Fox*, that "apply standard quantum meruit contract law in the attorney-client context").

**{¶ 47}** Finally, Ms. Willman and Mr. Woodworth assert that the trial court erred in failing to grant summary judgment in their favor because "L&V's termination/withdrawal was unjustified and thus, [the firm] forfeited any claim to fees." (Brief of Appellants at 34.) In support, they cite to *Bernard v. Moretti*, 34 Ohio App.3d 317 (10th Dist.1987), in which an attorney withdrew after a client who had failed to pay for deposition expenses subsequently refused a settlement offer. Citing the refusal, the attorney attempted to sue his former client for breach of the contingency fee agreement. However, the settlement refusal was "not the basis for proof that the contingent fee contract was breached" because

the attorney's compensation was contingent upon recovery, and no recovery had occurred. *Id.* at 319.

{¶ 48} Quantum meruit was not an available remedy to the attorney in *Bernard* because, unlike L&V, his labor bore no fruit. L&V did not sue Ms. Willman and Mr. Woodworth for breach of contract. As discussed, the firm's claim in quantum meruit did not arise under the parties' agreement. The claim did not even accrue until Ms. Willman and Mr. Woodworth had settled the 2018 Litigation, after the parties' agreement had terminated. *See Reid v. Lansberry*, 68 Ohio St.3d 570 (1994), paragraph two of the syllabus (holding that an "attorney's cause of action for a fee recovery on the basis of *quantum meruit* arises upon the successful occurrence of the contingency" originally contemplated in the fee agreement).

{¶ 49} "At the time of the mediation conference, there were no disagreements or concerns involving L&V and Clients other than the value of the Clients' claims," Ms. Willman and Mr. Woodworth claim. (Brief of Appellants at 40-41.) This statement cannot be reconciled with the tone of the parties' emails in March of 2017, several months before the mediation in May. (*See* Pl.'s Ex. 14., Mar. 24, 2017 email (describing clients' consultations with other attorneys as "not really helpful" and "frustrating," and doubting that clients had confidence in firm's "analysis" of the case).) Whether or not L&V was "justified" in withdrawing from representation was not clear to the trial court based on the evidence presented to it on summary judgment, so it denied the motion and proceeded to a bench trial. This was the proper ruling when much of the controversy to resolve required evaluating the parties' versions of their working history, as well as the credibility of each individual. *See Law Offices of Russell A. Kelm v. Selby*, 10th Dist. No. 15AP-1135, 2017-Ohio-8239 (affirming judgment in quantum meruit action that client had constructively terminated the attorney-client relationship, where trial court had denied motion for summary judgment by client because genuine issues of material fact existed concerning circumstances of discharge).

{¶ 50} Under the summary judgment standard, judgment as a matter of law in favor of Ms. Willman and Mr. Woodworth would only have been appropriate if they had shown, based on a lack of any genuine issue of material fact, that L&V could not prove its quantum meruit claim. But their briefing does not describe any absence of a genuine issue of material

fact in the evidentiary record or otherwise argue in light of the standard under Civ.R. 56. Accordingly, the second assignment of error is overruled.

### C. Third Assignment of Error

{¶ 51} In the third assignment of error, Ms. Willman and Mr. Woodworth argue that the trial court erroneously admitted hearsay evidence to prove the $550,000 mediator's proposal to settle. The trial court allowed testimony from Mr. Leeseberg about the mediator's proposal, ruling that it was not hearsay. (Tr. at 342.) However, appellants argue, the trial court later relied on the $550,000 amount when determining that L&V was entitled to one third of that amount as compensation. Thus, Ms. Willman and Mr. Woodworth argue that the trial court erroneously relied on hearsay statements "for the express purposes [sic] of establishing the truth of the matter asserted therein; i.e., that the defendants in the 2015 Litigation agreed to a $550,000 'mediator's proposal' and consequently, that L&V 'earned' a $550,000 offer."[3] (Brief of Appellants at 47.)

{¶ 52} "A trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that materially prejudices the affected party." *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 89 Ohio App.3d 17, 2015-Ohio-3841, ¶ 41 (10th Dist.). "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20-21 (applying two-part standard to admission of alleged hearsay that "must first determine whether the trial court abused its discretion by admitting appellant's testimony," and, if so, "whether appellee's substantial rights were undermined by admission of the testimony").

---

[3] Ms. Willman and Mr. Woodworth also argue that Plaintiff's Exhibits 16 and 18, as well as a number of pages of the trial transcript, contain hearsay statements, but they fail to identify any alleged hearsay statements in those parts of the record. Because "[i]t is not the role of this court to 'search the record or formulate legal arguments on behalf of the parties,' " we will not sift through pages of emails or the trial transcript and speculate as to which statements appellants consider to be hearsay. *State ex rel. McKenney v. Jones*, 168 Ohio St.3d 180, 2022-Ohio-583, ¶ 28, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 19.

{¶ 53} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid. R. 801(C).

{¶ 54} Ms. Willman and Mr. Woodworth cite the following exchange during Mr. Leeseberg's direct examination to advance their hearsay argument:

> Q.    And do you recall if a mediator's proposal was made by Mr. Scott?
>
> A.    Yes.
>
> Q.    And what was the amount of the mediator's proposal?
>
> A.    $550,000.
>
> MR. MAZGAJ: I'm sorry. Your Honor. Just note my objection to the mediation.
>
> THE COURT: I will note your objection, Mr. Mazgaj.
>
> Q.    Did your clients agree to the mediator's proposal?
>
> A.    No.
>
> Q.    Did you ever come to believe that the defendants in the R-Pro case had accepted the mediator's proposal?
>
> A.    Yes.
>
> MR. MAZGAJ: Objection.
>
> THE COURT: What basis for the objection?
>
> MR. MAZGAJ: Hearsay.
>
> * * *
>
> THE COURT: Yeah. I'm going to overrule the objection. He's asking about Mr. Leeseberg's impression, not about—
>
> MR. MAZGAJ: Well, Your Honor, that has to come from a statement from somebody. And that is an issue in this case. So I'm sorry. I'm objecting. That's the basis.

(Tr. at 341-42.)

{¶ 55} It is not clear what the actual alleged hearsay statement was that Mr. Mazgaj first objected to. A statement is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid. R. 801(A). "An assertion is an utterance of the existence of a fact." *Wade v. Communications Workers of Am.*, 1st Dist. No. 84AP-57, 1985 Ohio App. LEXIS 7121, *11 (Sept. 24, 1985). However, the mediator's proposal was not "an oral or written assertion" that something was true. Evid. R. 801(A). Furthermore, "some utterances do not constitute assertions but, instead, constitute what has been referred to as verbal acts, being the uttering of words which have independent legal significance under substantive law, such as words constituting the offer and acceptance of a contract." *Id.* "A 'mediator's proposal' is a double-blind settlement offer" that may, "[i]f both parties accept the offer," result in a binding settlement agreement. *Scottsdale Ins. Co. v. Yazdi*, C.D.Cal. No. CV 20-8701-MWF (AFMx), 2022 U.S. Dist. LEXIS 95245, *8 (May 10, 2022). Thus, Mr. Leeseberg's testimony about the mediator's proposal was more indicative of " a 'verbal act' or 'operative fact' that is offered, not for the truth of matters asserted, but because the question of whether the statement was uttered has legal or factual significance of itself." *Booher Carpet Sales v. Erickson*, 2d Dist. No. 98-CA-0007, 1998 Ohio App. LEXIS 4643, *8-9 (Oct. 2, 1998) (holding that out-of-court statement by defendant's wife to declarant witness that plaintiff "would receive payment for the tile-work was offered to show a promise on her part" was a verbal act that "falls outside of the general definition of hearsay"). *See also Wade* at *12 (rejecting argument that plaintiff's testimony about negotiation of employment terms was hearsay because it amounted to verbal acts describing "the entering into of a contract").

{¶ 56} Even assuming, for the sake of argument, that Mr. Leeseberg's response amounted to hearsay, the trial court did not materially prejudice Ms. Willman and Mr. Woodworth by overruling the objection because their attorney, Frank Mazgaj, elicited the same information from both of them during their direct examinations. Mr. Mazgaj and Ms. Willman had the following exchange:

> Q.     When that meeting ended, what did you do?
>
> A.     Well, [the mediator] discussed with us again about what our bottom line number was. And [Mr. Woodworth] expressed again that it was $800,000. And then [the mediator] brought up the $550,000 number, and so we

had some back-and-forth conversation about that, and he told us to think about it and go home and pray about it.

(Tr. at 512.)

{¶ 57} On recross, Mr. Mazgaj asked: "Tell me as best you recall, please," and Ms. Willman responded in part that the mediator "said if I can get $550,000, will you accept it?" *Id.* at 549.

{¶ 58} When examining Mr. Woodworth, Mr. Mazgaj pursued a similar line of questioning:

Q.      And tell me about that meeting.

A.      We sat down, he started discussing about what he thought was a good number for a settlement. And, of course, I can't remember everything about what all was said. But he finally got to a point where he said, if I can get you -- and I'm going to emphasize the word "if." If I can get you $550,000, will you accept this proposal?

*Id.* at 662-63.

{¶ 59} Because their attorney procured from Ms. Willman and Mr. Woodworth what they claim was inadmissible hearsay when testified to by Mr. Leeseberg, the trial court did not prejudice them by overruling the objection.

{¶ 60} Their attorney's other hearsay objection concerned Mr. Leeseberg's belief that the defendants in the 2018 Litigation had accepted the mediator's proposal. Once again, the objection identified no out-of-court statement by someone other than Mr. Leeseberg. Although Mr. Mazgaj asserted that Mr. Leeseberg's belief "ha[d] to come from a statement from somebody," Mr. Leeseberg repeated no statement from anyone. (Tr. at 342.) The trial court did not err when it rejected these hearsay objections. Accordingly, the third assignment of error is overruled.

### D. Fourth Assignment of Error

{¶ 61} In the fourth assignment of error, Ms. Willman and Mr. Woodworth argue that the trial court abused its discretion when it found that they constructively terminated the attorney-client relationship with L&V. Relying on the same law presented in support of the second assignment of error, they again argue that the trial court "should have found

that L&V, not Clients, terminated the attorney-client relationship." (Brief of Appellants at 53.) As before, they assert that the trial court should have found that Mr. Leeseberg's email terminated their relationship with the firm instead of the acts that the trial court cited when concluding that Ms. Willman and Mr. Woodworth constructively terminated the relationship. *Id.* at 53-54.

**{¶ 62}** As previously discussed, quantum meruit was an available remedy to L&V regardless of which party actually terminated the representation. "Upon discharge or withdrawal, a lawyer may also recover from a client the reasonable value of the services rendered under the doctrine of quantum meruit, which literally entitles the lawyer to 'as much as [is] deserved.' " *Farmer* at ¶ 32. Even if the trial court had instead found that L&V had withdrawn from the representation by sending the email, the firm would still have been allowed to pursue a claim in quantum meruit. The fourth assignment of error fails to describe any error made by the trial court and is therefore overruled.

### E. Fifth Assignment of Error

**{¶ 63}** In the fifth assignment of error, Ms. Willman and Mr. Woodworth argue that the trial court abused its discretion by determining that their contingent fee agreement with L&V allowed the firm to recover attorney fees. Once again referencing their arguments and the case law cited in support of the second assignment of error, they argue that the parties' agreement "did not permit L&V to recover fees if L&V terminated or withdrew from the representation." (Brief of Appellants at 55.)

**{¶ 64}** We note first that appellants cite to no portion of the trial court's decision to support their assertion that it awarded fees to L&V under the parties' contingent fee agreement. *See id.* at 54-55. As discussed, the agreement was not the basis for the fee award because quantum meruit is an equitable action that does not arise under contract. Rather, as the trial court described it, it was the "exercise" of "its powers under the 'natural law of equity' " that allowed it to compensate the firm for the services it rendered to Ms. Willman and Mr. Woodworth. (Decision & Entry at 32.) Furthermore, for the reasons previously discussed when analyzing the second assignment of error, the agreement did not preclude an award of fees under a theory of quantum meruit. The fifth assignment of error is overruled.

### F.  Sixth Assignment of Error

{¶ 65}  In the sixth assignment of error, Ms. Willman and Mr. Woodworth argue that the trial court abused its discretion by concluding that L&V justifiably withdrew from the attorney-client relationship.  "The Trial Court should have held that the withdrawal was unjustified and [that L&V] forfeited any claim to an earned fee," they argue.  (Brief of Appellants at 57.)  They argue that an attorney who withdraws from representation because their "client won't agree to settle a case for a certain sum" must forfeit any claim to fees because the termination is unjustified, citing *Bernard v. Moretti*, 34 Ohio App.3d 317 (10th Dist.1987), among other cases.  *Id.* at 56.  In their assessment, the trial court "abused its discretion by arbitrarily and unreasonably concluding that L&V's withdrawal was justified." *Id.* at 57.

{¶ 66}  This assignment of error implicates (without specifically addressing) the trial court's factual findings after the bench trial.  A manifest weight of the evidence standard applies to appellate review of a judgment entered after a bench trial.  App.R. 12(C).  Under this standard, a reviewing court must be "guided by a presumption that the findings of the trier-of-fact were indeed correct."  *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  This presumption arises from "the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  *Id.*  As long as "some competent, credible evidence going to all the essential elements of the case" supports the judgment, the reviewing court will not reverse.  *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).  On the other hand, the appellant court reviews conclusions of law under a de novo standard, with no deference to trial court.  *Long Beach Assn. v. Jones*, 82 Ohio St.3d 574, 576 (1998).

{¶ 67}  Under Rule 1.16 of the Ohio Rules of Professional Conduct, "a lawyer may withdraw from the representation of a client" for a number of reasons.  A lawyer may withdraw if "the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client."  Ohio Prof.Cond.R. 1.16(b)(6).  A lawyer may also withdraw if "other good cause for withdrawal exists."  Ohio Prof.Cond.R. 1.16(b)(9).  "Generally, the attorney-client relationship is consensual and, thus, subject to termination by the acts of either party."  *Starner v. Onda*, 10th Dist. No.

22AP-599, 2023-Ohio-1955, ¶ 31. "Conduct which dissolves the essential mutual confidence between attorney and client signals the termination of the attorney-client relationship." *DiSabato v. Thomas M. Tyack & Assocs. Co., L.P.A.*, 10th Dist. No. 98AP-1282, 1999 Ohio App. LEXIS 4212, *5 (Sept. 14, 1999), citing *Brown v. Johnstone*, 5 Ohio App.3d 165 (9th Dist.1982).

{¶ 68} Nothing in the record contradicts the trial court's finding that Ms. Willman and Mr. Woodworth engaged in a "pattern of conduct" that ultimately "undermin[ed]" the firm's representation and amounted to "a constructive termination of the attorney-client relationship."[4] (Decision & Entry at 26-27.) They "continued to insist" on pursuing claims, ignoring the opinion of L&V and of their own expert witness in the 2018 Litigation, disregarding their attorneys' litigation strategy. *Id.* at 26. They consulted with other attorneys about such claims but refused to disclose their identity to L&V, who could not consult with those attorneys to determine what information their clients had provided, undercutting the firm's ability to accurately advise their clients. They withheld settlement authorization and property damage estimates, causing a delay in mediation, and then refused "to make any final decisions regarding settlement" when pressed. All of this supports the trial court's finding that "L&V had just cause to terminate the relationship under Prof.Cond.R. 1.16(b)(6) and (b)(9)." *Id.* at 27. Contrary to appellants' assertion that L&V withdrew over a disagreement with them about the settlement amount, the trial court specifically found that "L&V's loss of confidence did not arise solely because [appellants] refused to settle." *Id.* In addition, the trial court made detailed assessment of the parties' credibility while testifying, to which we defer. Nothing in the record supports the argument that the trial court "arbitrarily and unreasonably conclude[d] that L&V's withdrawal was justified." (Brief of Appellants at 57.) Because competent and credible evidence supported the trial court's conclusions, the sixth assignment of error is overruled.

---

[4] Appellants argue that the trial court's "recollection of the testimony" about their consultation with other attorneys was "inaccurate," and argue that the attorneys named by the trial court were not actually ones referenced in Mr. Leeseberg's email or testimony. (Brief of Appellants at 50.) Even if the trial court inaccurately named those attorneys, it also referenced "numerous other attorneys" referenced by Mr. Leeseberg. (Decision & Entry at 27.)

### G. Seventh Assignment of Error

{¶ 69} In the seventh assignment of error, Ms. Willman and Mr. Woodworth argue that the trial court abused its discretion by awarding $183,333 to L&V for services the firm rendered to them before the termination of representation.

{¶ 70} A trial court's award of attorney fees in quantum meruit is reviewed for an abuse of discretion. *Reid v. Lansberry*, 68 Ohio St.3d 570, 576 (1994); *Law Offices of Russell A. Kelm v. Selby*, 10th Dist. No. 15AP-1135, 2017-Ohio-8239, ¶ 29. "A trial court called upon to determine the reasonable value of a discharged contingent-fee attorney's services in *quantum meruit* should consider the totality of the circumstances involved in the situation." *Reid* at 576. Factors to be considered may include "[t]he number of hours worked by the attorney before the discharge," as well as "the recovery sought, the skill demanded, the results obtained, and the attorney-client relationship itself." *Id.*

{¶ 71} The trial court engaged in a lengthy and detailed discussion before concluding that the legal services L&V had performed entitled it to an award of $183,333. L&V, as a plaintiff's firm working on a contingency basis, did not bill by the hour, so its expert witness attempted to reconstruct the firm's work product as if it had. The initial figure of $135,352 resulted from "documented work and independent secondary sources" alone, but the trial court accepted the expert's view that this amount omitted 20 to 30 percent of the actual work the firm had done. (Decision & Entry at 29-30.) Because the litigation was "complex, with multiple defendants and multiple theories of injury," and because there were "many challenges to recovery," as well as "issues" with both the clients and the defendants, the trial court concluded that the settlement amount was "a favorable outcome" for Ms. Willman and Mr. Woodworth. *Id.* at 30. Because they did not present any "evidence of a greater settlement offer" resulting from the efforts of their final attorney, the trial court found that "[t]he evidence was uncontroverted that L&V were solely responsible for the $550,000 settlement offer." *Id.* at 31. Accordingly, the trial court awarded the firm one third of that amount, which corresponded to the amount they would originally have been entitled to under the contingency fee agreement.

{¶ 72} Ms. Willman and Mr. Woodworth have not demonstrated an abuse of discretion in the trial court's findings or the resulting award. They assert that other than inadmissible hearsay, there was "absolutely zero evidence in the record" to support the trial

court's conclusion that the defendants in the 2015 Litigation had accepted the mediator's proposal to settle for $550,000. (Brief of Appellants at 58.) We have already pointed to the direct testimony of Ms. Willman and Mr. Woodworth when rejecting their hearsay argument to show that the record contained evidence of the amount of the mediator's proposal. Thus, the trial court did not arbitrarily conjure dollar amounts when discussing the fee award. The amount of the final settlement was identical to the amount L&V had obtained as an offer for Ms. Willman and Mr. Woodworth at the point that the attorney-client relationship deteriorated beyond repair. We note that "the *quantum meruit* recovery of a discharged attorney should be limited to the amount provided for in the disavowed contingent fee agreement," and the trial court's award did not exceed this amount. *Reid* at 576. The trial court did not abuse its discretion when concluding that this represented the fruit of their labor for their clients.

## III. Conclusion

{¶ 73} For the reasons discussed, the trial court did not err as argued by Ms. Willman and Mr. Woodworth in any of the seven assignments of error. Accordingly, all assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BEATTY BLUNT and JAMISON, JJ., concur.

_____